(165 App. Div. 221)

### ADIKES et al. v. LONG ISLAND R. CO.

(Supreme Court, Appellate Division, Second Department. December 24, 1914.)

1. RAILROADS (§ 216*)—TRACKS AND SWITCHES—RAILROAD'S RIGHT TO REMOVE—STATUTES.

In 1897 defendant railroad, at plaintiff's expense, built a switch from its main track to plaintiff's warehouse, under an agreement providing that on 10 days' notice it might discontinue it, on paying to plaintiff the value of the part removed. In 1907 the Public Service Commissions Law (Laws 1907, c. 429) was enacted, section 27 of which empowered the Commission, in case a railroad failed to install a switch upon due application, to investigate and order its establishment, and upon application of a railroad to order a discontinuance of any switch. In 1906 Interstate Commerce Act, § 1, was amended (Act Feb. 4, 1887, c. 104, 24 Stat. 379, amended by Act June 29, 1906, c. 3591, 34 Stat. 584 [Comp. St. 1913, § 8563]), giving similar powers to that Commission, without specifically providing for the discontinuance of sidings. Held, in an action to enjoin defendant's removal of the switch, that even though, in the absence of statute, it was within defendant's discretion to build and discontinue sidings and to remove those built at its own expense, yet, as plaintiff's switch was constructed at its expense, defendant could not deprive plaintiff of

it without reserving the right to do so, that the intervention of the Commission was not authorized, unless the parties were unable to agree, and that, as the reservation was a partial surrender of the railroad's right to remove the switch at will, it was an agreement not nullified by the statutes.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 713; Dec. Dig. § 216.*]

2. APPEAL AND ERROR (§ 1177*)—REVERSAL—NECESSITY OF NEW TRIAL.

In an action to enjoin a railroad's removal of a switch after notice, as provided in the agreement for its construction, where it appeared that the siding had been removed four times, but where the evidence did not show what departure was made from the siding agreed on, or whether the agreement authorized such changes, there should be, on reversal of a judgment for plaintiff, a new trial, that the nature of such changes might appear.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4597–4604, 4606–4610; Dec. Dig. § 1177.*]

Jenks, P. J., and Stapleton, J., dissenting.

Appeal from Equity Term, Queens County.

Action for injunction by John Adikes and another against the Long Island Railroad Company. Judgment for plaintiffs, and defendant appeals. Reversed, and new trial granted.

The opinion of Blackmar, J., at Special Term on the motion to continue the temporary injunction, was as follows:

In 1897 a contract was made between the plaintiffs and the defendant, by virtue of which a switch connection was made between the defendant's railroad and the plaintiffs' warehouses on the northerly side of the railroad tracks, near and to the west of Jamaica and adjoining the freight yards of the railroad company. Between 400 and 500 cars of freight per year have been received by plaintiffs over the connection, and the revenue therefrom to the railroad company has been ample to justify the connection. Recently important and radical improvments have been begun by the railroad, which involve the elevation of its tracks through Jamaica, the elimination of grade crossings, and the removal of its freight yards, and relocating them east of Jamaica. The contract of 1897 provided that the railroad reserved the right to discontinue this switch connection after 10 days' notice. Pursuant thereto the defendant has given such notice, and the connection has remained only by virtue of a temporary injunction issued in this case.

This action is brought to permanently enjoin the discontinuance of this connection. I am of the opinion that the contract of April 24, 1897, has no bearing on the controversy. At the time it was made the installation of sidings and switches to accommodate shippers owning warehouses on abutting land rested solely in the discretion of the railroad companies, uncontrolled by law. After a switch was installed, the railroad company had the right to discontinue it at will. The contract in question, after providing for the installation of a frog switch and siding for plaintiffs' accommodation, proceeded: "The party of the first part [the railroad company] hereby reserves the right to take out the switch and frog, and that portion of the track owned by said party of the first part at the expiration of ten (10) days after written notice of intention to do so has been served on the parties of the second part." This clause expresses the intent of the contracting parties that the railroad company does not surrender, except for a period of 10 days after notice, the right which it already had to discontinue. The railroad company did not acquire the right to remove the switch by the contract. The right already existed, and by the terms of the contract is "reserved," except for 10 days. The notice has been given, the 10 days have elapsed, and the rights of both

parties as to the switch are governed by law, and not by the contract. The terms of the contract may therefore be disregarded.

It was the law, long before railroads existed or were imagined, that the grantee of a franchise for public service was under a legal duty to operate it. The acceptance of the grant imposed the duty, and the railroads accepting a franchise from the sovereign became, by virtue of this principle of the common law, public service corporations, burdened with the duty of service to the public. That such duty may be limited, defined, and extended by legislative act is settled beyond question; but it exists independent of statute. There has never been any doubt that switch connections for the benefit of individual shippers were within the scope of the duty of public service. Otherwise, they would be ultra vires and unlawful. But as the determination of where and how they should be established was vested in the directors of the railroad company, it followed that no shipper had a right to require such connection. This has been changed by both the state of New York and the United States, legislating under the power granted by the United States Constitution to regulate commerce among the states.

The Public Service Commissions Law, passed June 6, 1907, made it the duty of the railroad company to provide switch connections "upon the application of any shipper tendering traffic for transportation * * * whenever such side track and switch connection is reasonably practicable, can be put in with safety and the business therefor is sufficient to justify the same." Section 27, Public Service Commissions Law. This duty, the exercise of which had before been vested in the directors of the railroad, became thereafter definite and obligatory, wherever the connection was reasonably practicable, could be put in with safety, and the business therefor was sufficient to justify it. When these conditions exist the duty. is absolute. But as there may be difference of opinion as to whether these conditions exist, the Legislature created a commission, whose power and duty it is to investigate and determine whether such conditions exist. If such commission determines that such conditions do exist, and there is no switch connection, it may order one installed upon reasonable conditions as to compensation, and if there is a switch already installed, and the conditions are found not to exist, it may order its discontinuance. Section 27, subd. 2, of the law. The right then depends upon the existence of the conditions prescribed by statute. It is not granted by the order of the Commission, but rests on the statutory amplification of the common-law duty of public service.

As the power to regulate the duty of public service is a legislative function, it is a part of the exercise of such function to ascertain whether the conditions to the obligation of the duty exist. This has been delegated by the Legislature to the Public Service Commission under the modern limitation of the doctrine "delegatus non potest delegari." The right to determine whether these conditions exist does not lie in the courts. This determination is a part of the exercise of the legislative power of regulating the public service under a railroad franchise. It is not therefore for the court to determine finally whether the plaintiffs' switching connections should be continued or not. This power, in the first instance, rests in the Public Service Commission. But, on consideration, it seems to me plain that an existing switch connection may not, under the Public Service Commissions Law, be discontinued without the order of such Commission. Obviously, the Legislature intended to take within the control of the state the final determination of the question whether such connections should exist, and so withdrew the power to discontinue or refuse installation from the jurisdiction of the directors of the railroad.

The court will take notice that numerous so-called private switch connections existed when the act was passed. Their very existence showed that the railroads recognized them as practicable, safe, and profitable. If they should be discontinued, the Commission would have the power to order them reinstated. It seems to me that the Legislature intended that these also should be protected against arbitrary action by the road. This is not to hold that the Legislature granted special privileges to those who had switch connections, but that switch connections under proper conditions are a part of the public service, and that, subject to the determination of the Public

Service Commission, the installation of such a switch is an admission by the railroad which installed it that the proper conditions to service exist. This construction of the act is reasonable, and infringes no right of the defendant. It may be that, in view of the radical improvements of the railroad in and through Jamaica, which were undoubtedly undertaken to promote safety of operation and to increase the public service, and which involve a contract with the city for the elimination of grade crossings, the present switch connection of the plaintiffs is no longer reasonably practicable or safe. But this is a question which I cannot determine. It is for the Public Service Commission.

The Interstate Commerce Act also contains a provision of import similar to that quoted from the Public Service Commissions Law, except that it contains no express provision for application to the Commission for discontinuance. Ninety per centum of the traffic moving over the switch in question is interstate. I do not understand that the state entirely loses jurisdiction of the roadbed and track of a railroad within its borders simply because interstate commerce moves over it. I have no idea of attempting to trace or even indicate the line of demarcation between the jurisdiction of the United States on the one hand and the several states on the other over railroad properties which are used in both intrastate and interstate commerce. It is sufficient to say that the Public Service Commissions Law applies to physical switch connections in the state and to intrastate commerce moving over them.

The injunction is continued, until the Public Service Commission orders the discontinuance of the connection. Costs to plaintiffs.

Argued before JENKS, P. J., and BURR, THOMAS, RICH and STAPLETON, JJ.

Alfred A. Gardner, of New York City (Louis J. Carruthers, of New York City, on the brief), for appellant.

Augustus Van Wyck, of New York City, for respondents.

THOMAS, J. Pursuant to agreement with plaintiffs, the defendant in 1897 built a switch from its main track to receive for transportation plaintiffs' products at Jamaica. The agreement enabled the defendant upon 10 days' notice to discontinue the connection, and in such case defendant would become plaintiffs' debtor for the value of the part removed, inasmuch as the cost of the siding was met by the plaintiffs. This left the remaining expenditure at the loss of the plaintiffs. Section 27 of the Public Service Commissions Law was enacted June 6, 1907, and on June 29, 1906, the federal Interstate Commerce Act, section 1, amendatory of the original act, was passed. The state act vested in the state commission the power, in case a railroad corporation failed to install a switch connection upon due application, to order, upon petition of the shipper and hearing and investigation, the establishment and maintenance of the siding, and adds:

"And may in like manner upon the application of the railroad corporation order the discontinuance of such switch connection."

The federal act furnishes similar power to the Commission, but does not specifically refer to the discontinuance of sidings.

[1] The question narrows to this: Is the stipulation to enable the defendant to disconnect the siding rendered ineffective by either the state or federal statute? It is argued that when the agreement was made the installation and discontinuance of switches was within the discretion of the railroad corporation, and that the agreement did not affect that right, and would not have done so if it had not contained the

reservation; in other words, that the company gained nothing by the reservation, and that the statute operated as if no agreement had been made. In the absence of statutes otherwise constraining it, the company did have the discretion to build and to discontinue sidings, and, had the siding been built at its expense, it could have withdrawn it at will. But it constructed it at the expense of the shippers, and could not, in its discretion and at any time, deprive them of it without reserving the right to do so. It was surrendering in some degree the right to give and to withdraw at will, and to preserve that right it stipulated for the reservation. The plaintiffs' position is that the railroad company could contract to furnish a siding at the shippers' expense, and after construction and payment therefor immediately take it away without full reimbursement, and that no reservation of right to do so was necessary.

The proposition conflicts with all sense of justice. It may be that such contract would impliedly be subject to the duty owing the state to operate its railroad pursuant to its charter, and that it was contemplated that the agreement would yield to such obligation. But the plaintiffs are not contending that such exigency has arisen, but rather they urge that the present arrangement is both safe and practicable. If that be the case, it would not have been ultra vires to surrender the right to remove the siding until the due operation of the railway demanded its removal. So that the agreement did reserve something of value to the company. Hence the situation is that the shippers got and paid for a siding pursuant to an agreement that the company could take it away by reimbursing plaintiffs for a part of the expense.

But plaintiffs now urge that the subsequent statute in effect should be interpreted to read:

"No siding already constructed shall be removed without the order of the Commission, although the parties agreed prior to the passage of the statute that the defendant upon a certain payment and notice could remove it at any time."

The provision or withdrawal of a siding is initially a matter between the shipper and the carrier, and the intervention of the Commission is not authorized unless the parties have been unable to agree. Here they did agree, and the company proposes to act upon the authority of the agreement. In my judgment the statute does not overlay and nullify the agreement. The practical question is: Who first shall apply to the Commission? The plaintiffs erroneously suggest that they cannot apply for a siding because they have one. In law they have none. One exists because the defendant is enjoined from removing it in the exercise of a legal right. The Public Service Commission is enabled by its superior facilities to investigate and to determine whether the plaintiffs should have a siding, and it is concluded that the burden rests upon the plaintiffs to initiate the application.

[2] I have not considered the fact that the siding was four times removed, inasmuch as the evidence does not show what departure was made from the siding designated in the agreement, or whether the agreement authorized the changes. In the absence of such evidence, there should be a new trial, that the nature of such changes may ap-

pear. Meantime the interposition of the Public Service Commission may be sought, if plaintiffs be so advised.

The judgment should be reversed, and a new trial granted; costs to abide the final award of costs.

BURR and RICH, JJ., concur. JENKS, P. J., and STAPLETON, J., vote to affirm, upon the opinion of Mr. Justice Blackmar at Special Term.